UNITED STATES of America, Plaintiff,

v.

Charles Kenneth HEADDRESS and Kelly Royja Ankerpont, Defendants.

No. 2:95–CR–249C.

United States District Court,
D. Utah,
Central Division.

Nov. 14, 1996.

**1274**

Barbara Bearnson, Assistant United States Attorney, Salt Lake City, UT, for Plaintiff.

Michael Jaenish, Mary Corporon, Salt Lake City, UT, for Defendants.

## ORDER

CAMPBELL, District Judge.

On November 1, 1996, United States Magistrate Judge Ronald N. Boyce issued a Report and Recommendation in this case, recommending that the defendants' motion to suppress be denied. No objections were filed. The court finds that the magistrate's findings and conclusions are correct in all respects, and hereby adopts the magistrate's Report and Recommendation as the order of the court. Accordingly, defendant's motion to suppress is DENIED.

## REPORT & RECOMMENDATION

BOYCE, United States Magistrate Judge.

The defendants, Royja Ankerpont and Charles Headdress, have been indicted for the crime of murder in Indian Country, allegedly occurring on or about December 1, 1995 within the boundaries of the Uintah–Ouray Reservation (File Entry # 15). The defendant Headdress made a motion to dismiss the indictment or to suppress evidence alleging the Government destroyed or failed to preserve substantial physical evidence (File Entry # 43). The defendant submitted a memorandum further detailing his claims as to this motion (File Entry # 44). The defendant Headdress also made a motion to sup-press a statement of Headdress contending there was inadequate compliance with *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (File Entry # 46). Headdress also contends he was denied food and held incommunicado for a period before his statement and that his statement was involuntary under the Fifth Amendment (Id.).

The defendant Ankerpont also submitted a motion to suppress statements taken from him contending there was a violation of *Miranda,* supra, and his statements were involuntary (File Entry # 66). Defendant Ankerpont filed a supplemental memorandum to suppress statements including one made near a bridge and stream bed where the deceased's body was found (File Entry # 96). Defendant Headdress also filed a supplemental memorandum in support of his motion to suppress his post arrest statements (File Entry # 97). That memorandum also raised the issue that Headdress was arrested at approximately 11:30 a.m. on December 1, 1995 and transported to the Fort Duchesne jail and was not taken before a United States Magistrate Judge until December 4, 1995. The United States has filed a response to the defendants' motions contending no violation of the Constitution or other law occurred (File Entry # 102). An addendum to that response was also submitted (File Entry # 103).

Hearings were held on the motions to suppress on five separate days: March 22, 29, April 6, April 10, and April 24, 1996. The case has been referred to the magistrate judge under 28 U.S.C. § 636(b)(1)(B). This report and recommendation is submitted pursuant to the reference on the defendants' motions to dismiss and suppress.

### Evidence

Officer Jay Mountain Lion, a Ute Tribal officer of the Bureau of Indian Affairs Police Department, testified (Tr. p. 33). He is a patrol officer. On December 1, 1995 he was on duty from 6:00 a.m. to 2:00 p.m. At approximately 7:26 a.m. he was on patrol near Elk Horn Loop Road in a patrol unit when a vehicle approached from behind flashing its lights on and off (Tr. pp. 34–35).

Mountain Lion stopped and the other vehicle pulled alongside. Defendant Ankerpont was the driver and his mother, Ms. Ice was a passenger (Tr. p. 35). The officer knew them, they are cousins to the officer. Defendant Ankerpont is Ms. Ice's son (Tr. p. 36). Ms. Ice said she wanted to report an assault and pointed towards the east. Ankerpont said they threw him in the river. Ankerpont said it was Tilford Tapoof (the deceased murder victim). The defendant and his mother were in their car (Tr. p. 37) and the officer was in his vehicle. The officer told the defendant and his mother to go first and he would follow. They stopped at the White Rocks Canyon turnoff where there is a bridge and a culvert. They all parked their vehicles and got out (Tr. pp. 38–39). Mountain Lion asked what happened but Ankerpont did not respond but he walked off the bridge and pointed underneath the bridge. The officer observed the defendant pointing and a red substance on the rocks. The officer believed the substance to be blood (Tr. p. 40). The officer moved closer and could see an individual lying face down in a river or creek. It was Tapoof, he was 10 to 12 feet away. The officer was on the creek bed and Ankerpont was next to him (Tr. p. 41). The officer went to the body and checked for a pulse. There was no response. The deceased had visible injuries to the back of the head and body (Tr. pp. 41–42). The body was lying face down without a shirt. The officer directed Ankerpont to go back to the bridge, in order to preserve the crime scene. Ankerpont did not touch the body (Tr. p. 42). Ankerpont went to the bridge. The officer did not make any threats and had advised Ankerpont to return to the bridge the same way he had come down to where the body was located. This was in order not to disturb the crime scene (Tr. p. 44).

The officer noticed a red substance in the area underneath where Ankerpont's vehicle was parked (Tr. p. 44). The officer asked Ankerpont to move his vehicle off the bridge; the officer believed the substance was blood. Ankerpont said he didn't have anything to do with what happened (Tr. p. 44). Defendant Ankerpont moved his vehicle. He was not

threatened and Ms. Ice was standing by the bridge.

The officer called his superior Lieutenant James Two Bulls (Tr. p. 45). Mountain Lion advised Two Bulls of what had happened and was advised to secure the area and wait for other units (Tr. p. 46). Officer Mountain Lion asked Ms. Ice what Ankerpont had told her. Ice said Ankerpont arrived at about 7:00 a.m. and she asked him what he'd done now. Ankerpont apparently said Charlie (Headdress) and a juvenile beat up Tilford (Tapoof) and threw him in the river. Ice wanted to go with Ankerpont to the bridge to see what happened (Tr. p. 47). That is when they saw Mountain Lion's patrol unit. Ankerpont said he drove the other two participant individuals home (Tr. p. 48). Mountain Lion asked Ice if she knew what the fighting was about and Ice said that Ankerpont didn't say anything. Ice was crying during the time and Mountain Lion tried to comfort her. Ankerpont was standing nearby. Nothing was done to indicate Ice and Ankerpont were in custody, they were not handcuffed (Tr. p. 49).

Mountain Lion then asked Ankerpont if he would make out an affidavit and he agreed (Tr. p. 49). No threats were made or force used. The officer read Ankerpont his preinterrogation rights under *Miranda*.[1] This was on the bridge (Tr. p. 50). The *Miranda* warnings were read from a notebook and complied with the *Miranda* warning requirements (Tr. p. 51). Mountain Lion asked Ankerpont if he understood and he replied "yes." Ms. Ice was standing next to him (Tr. p. 52). Mountain Lion asked Ankerpont who was with him when the event occurred and he said a juvenile and Charlie Headdress were the ones involved (Tr. pp. 52–53). Ankerpont and Ice were not wearing coats and Mountain Lion offered them blankets which they took and wrapped around them (Tr. p. 54). Mountain Lion noticed Ankerpont had a red substance like blood on his pants. Mountain Lion gave Ankerpont the affidavit form and asked him to write what happened (Tr. pp. 55–56). The officer asked Ankerpont if he would like to get in the patrol car, where he would be more comfortable, and

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct.     1602, 16 L.Ed.2d 694 (1966).

Ankerpont walked to the vehicle and sat on the front seat. Ankerpont started writing. About that time Lieutenant Two Bulls arrived (Tr. p. 57) and he was informed by Mountain Lion as to what occurred (Id.). Ankerpont finished writing and left the affidavit in the patrol car and he exited. Ms. Ice who was crying asked for a cigarette and went to her car and got one (Tr. pp. 57–58). Ankerpont got a cigarette from Ice. Mountain Lion got the affidavit (Tr. p. 59) (Exhibit 2).

Lieutenant Two Bulls spoke to Ankerpont. Mountain Lion had told Two Bulls that a *Miranda* warning had been given to Ankerpont (Tr. p. 60). Ankerpont was arrested and taken to the Ute Tribal jail at Fort Duchesne. He was not handcuffed (Tr. pp. 60–61).

At about 11:20 a.m., Mountain Lion assisted Officers Two Bulls and Cuch to arrest defendant Charles Headdress (Tr. pp. 61–62). He was arrested at the home of Betty Poowegup where Headdress lived. She is a relative. The home is about a quarter of a mile from the place where the body was found (Id.).

When Ice and Ankerpont first encountered Mountain Lion, Ms. Ice said she wanted to report an assault. Mountain Lion was in his car and then they drove to the crime scene (Tr. p. 64). At the scene both Ankerpont and Ice exited their vehicle without being told to do so (Tr. p. 64). Tapoof's body could not be seen. Ankerpont walked to the bridge down to the creek bed where he stood pointing. Mountain Lion followed and pointed (Tr. p. 65). Ankerpont did not touch the body (Id.). Mountain Lion went over to the body to check for a pulse and could detect none (Tr. pp. 67–68). The body was face down, the water was about six inches deep. He didn't know if the deceased's face was in the water (Id.). The officer did notice blood on the rocks and on the road (Tr. pp. 70–71). The officer did not perceive Ankerpont to have been under the influence of alcohol (Tr. pp. 74–75). The officer did not have any conversation with Ankerpont during the time he was filling out the affidavit other than to ask him who was with him at the time of the incident (Tr. p. 77). This was after Anker-

pont had been informed of his rights. Ankerpont was handcuffed at the scene following his arrest (Tr. pp. 78–79). Officer Mountain Lion arrived at the Fort Duchesne jail with Ankerpont at 8:58 a.m. He was left in the custody of Officer Blackbird (Tr. pp. 85–86). Mountain Lion returned to the crime scene.

When defendant Headdress was arrested, Lieutenant Two Bulls first spoke to Betty Poowegup (Tr. pp. 87–88). Poowegup let the officers in the house. She led the officer to a back bedroom where Headdress was asleep (Tr. p. 89). Headdress was wearing shorts. He went peacefully with the officers. He was taken to the Fort Duchesne jail (Tr. p. 91).

Lieutenant James Two Bulls, a Bureau of Indian Affair (BIA) officer at the Uintah–Ouray reservations in Utah, testified (Tr. p. 96). He was on shift from 6:00 a.m. to 2:00 p.m. He was the on scene commander as Captain Edward Reynolds was in Salt Lake City. He was advised as to the assault and condition of the body by Officer Mountain Lion (Tr. p. 97). He advised the dispatcher to contact the BIA Investigator, Anselm Tom and FBI Special Agent Mike McPheters, (Tr. p. 98) in Salt Lake City. He then went to the White Rocks Canyon turnoff (generally where the body was located) at 7:58 a.m. (Id.). He observed Ms. Ice, Ankerpont and Mountain Lion. He noticed a spot of blood 10 to 12 inches in diameter in the road (Tr. p. 99). He observed the body in the stream or culvert (Tr. p. 100). He noticed what appeared to be blood on the rocks. He spoke to Officer Mountain Lion who said the body was still warm to the touch (Tr. p. 101). Mountain Lion said Ankerpont told him the assault took place and involved a juvenile, and Headdress and the body was thrown in the creek (Tr. p. 102). Two Bulls examined Ankerpont's affidavit. Ankerpont and Ice were not handcuffed (Id.). The signature of Ankerpont and his name at the top of the affidavit (Exhibit 2) were added to the document at the Fort Duchesne Jail (Tr. p. 104). Two Bulls had a conversation with Ice in which she said Ankerpont had borrowed her vehicle the night before after she had fallen asleep. At 7:00 a.m. Ankerpont returned to the house with the vehicle (Tr. pp. 105–106).

Ice said Ankerpont had told her a juvenile and Charlie (Headdress) had beaten Tilford (Tapoof) and put him the river. Ice and Ankerpont were on their way there when they encountered Mountain Lion (Tr. p. 106). Ms. Ice had instructed her son, Ankerpont, to tell the truth (Tr. p. 107).

Two Bulls then went to Ankerpont and asked him if Mountain Lion had advised Ankerpont of his rights and he said he had. Two Bulls asked Ankerpont if he understood his rights and he said he did. Two Bulls asked what happened and Ankerpont said an argument occurred between the juvenile, Headdress and Tapoof and that Tapoof was assaulted and dumped in the river (Tr. p. 108). Then Ankerpont took Headdress and the juvenile to their residences (Tr. pp. 108–109). The statement was made when Ankerpont was standing outside of Officer Mountain Lion's vehicle. Ankerpont was not handcuffed and had a blanket around him (Tr. p. 109). Two Bulls observed the blood stains on Ankerpont's pants. He could smell the odor of alcohol on Ankerpont but could not tell the degree of his intoxication. He was not falling down and his speech was not slurred. He seemed intoxicated to the officer. Two Bulls decided to conduct a full sobriety test, a nystagmus test (Tr. p. 110). A horizontal gaze nystagmus test was conducted on Ankerpont which he failed (Tr. p. 111). Two Bulls arrested Ankerpont for public intoxication,[2] he wasn't sure he had probable cause to arrest for the homicide (Tr. pp. 111–112). This was at 8:09 a.m. (Tr. p. 113). On arresting Ankerpont, Two Bulls handcuffed him. Ms. Ice asked to speak to Ankerpont and she again told her son to tell the truth. Ice made a second request to speak to Ankerpont and said that if what he had told her was true, then everything would be alright (Tr. p. 114). Ankerpont was then taken to Fort Duchesne at about 8:35 a.m. and arrived at 9:18 a.m. (Tr. pp. 115–116). Ankerpont was given a breath test which reflected a blood alcohol level of .012 at 9:19 a.m. (Tr. pp. 116–117).[3]

At the Fort Duchesne Police station, Officer Two Bulls asked Ankerpont if he had written the statement in the affidavit. He said he did and stood by it. Ankerpont signed the affidavit as did Two Bulls, who placed Ankerpont's name at the top of the affidavit (Tr. pp. 117–118). No new *Miranda* warning was given to Ankerpont. He was not coerced or threatened and Officer Blackbird was nearby (Tr. p. 118).

Officer Two Bulls left the police station and near White Rocks he saw the vehicle of the deceased's brother and waived him over (Tr. p. 119). When Two Bulls informed the brother of the deceased death, the brother requested to perform a religious rite over the body. This would involve cedaring off the body with an Eagle feather. Two Bulls said if it was possible he would grant it. Two Bulls was called by the dispatcher who said investigator Tom had asked Two Bulls to stop the ambulance taking the body to Roosevelt, Utah and to bag the hands of the victim. Two Bulls met the ambulance at Ridleyville. The deceased's brother was a mile or two behind (Tr. pp. 120–121). Two emergency medical technicians were in the ambulance. They were hesitant to allow the body's hands to be bagged (Tr. p. 121). The body was in a zipped up body bag strapped on a gurney. The hands were not bagged or the body bag opened. The deceased's brother arrived with a box with religious items. He conducted a ceremony over the body (Tr. pp. 122–123). He held a sprig of cedar which was smoking and waived it over the body with an Eagle feather. He also was blowing on an Eagle bone pipe whistle. The deceased's brother, Jerry Tapoof, never touched the body. The ceremony lasted two minutes after which the brother left (Tr. p. 123). The ambulance went to a mortuary in Roosevelt, Utah (Tr. p. 124).

At 11:20 a.m., Two Bulls and Officers Terrance Cuch and Jay Mountain Lion went to Betty Poowegup's residence. This was to arrest Charlie Headdress. Two Bulls went

---

2. Public intoxication is an offense under § 13–4–106, Law and Order Code of the Ute Indian Tribe of the Uintah and Ouray Reservation, Utah.

3. The legal limit for a blood/alcohol level to operate a motor vehicle in Utah is .08. Utah Code Ann. § 41–6–44, § 10–1–1 of the Utah Traffic Code incorporates Title 41 Chap. 6 of the Utah law on driving under the influence.

to the door and knocked. Betty Poowegup came to the door. Two Bulls asked if Charlie Headdress lived there and was told he did. Two Bulls told her that he was there to arrest Headdress for a serious federal crime and asked for permission to enter the premises. Betty Poowegup gave her consent for Two Bulls to enter (Tr. pp. 124–125). She said Headdress was asleep in his bedroom, which Poowegup pointed out to the officers. The officers went to the room and observed a male in the bed. After he awakened he was asked if he was Headdress and he said he was. He was then arrested (Tr. p. 125). The defendant Headdress was given a *Miranda* warning after he was handcuffed, but he was not questioned (Tr. pp. 126–127). Headdress was taken to the Fort Duchesne Police Department. A few background questions were asked as to tribal membership and where Headdress was from. Headdress said he was from Fort Peck, Montana and was an Assiniboin Sioux (Tr. pp. 127–128). No further conversations were had at that time and Headdress was placed in a cell.

At 8:08 p.m. at the Fort Duchesne Police Department, FBI Special Agent Mike McPheters asked Two Bulls to witness an interview with Headdress. This was in a waiting room near the tribal court. It was not a jail cell and had no bars (Tr. p. 130). Two Bulls read the *Miranda* warnings to Headdress from a BIA form and he signed the form and he indicated he understood. He waived his rights and signed the waiver portion of the form (Tr. pp. 130–131, Exhibit 3). The document was signed by Two Bulls and McPheters as well. McPheters conducted the interview at 8:10 p.m. and it ended at 8:50 p.m. No threats or promises were made. One break was taken to get Headdress his eyeglasses (Tr. pp. 131–133). Headdress did not request any other break, food or water. Headdress gave a written statement, to which Two Bulls and McPheters signed as witnesses (Tr. p. 135 Exhibit 3A).

On December 1, 1995 at 8:58 p.m. Two Bulls was requested by Agent McPheters to witness an interview with defendant Ankerpont in the same place where the interview with Headdress had taken place (Tr. p. 137).

Prior to the interview Ankerpont was given a *Miranda* warning from a BIA form. He signed the form and the waiver at the bottom and made an oral waiver as well (Tr. pp. 137–138, Exhibit 4). Two Bulls and Agent McPheters also signed the form. The interview ended at 9:11 p.m. No promises or threats were made, Ankerpont was not under the influence of drugs or alcohol, and Ankerpont did not ask for food, water or cigarettes. There was an oral interview and Ankerpont gave a written version of the events. He gave an incriminating statement. Ankerpont signed the written statement (Tr. pp. 140–141, Exhibit 4A). McPheters signed the statement as a witness.

Headdress, following his arrest, arrived at the Fort Duchesne Jail at 11:51 a.m. He was given a breathalyzer test at 12:09 p.m. and it registered .068. When Headdress was arrested he previously had been asleep and was wearing a black T-shirt and black running shorts (Tr. p. 148). Headdress did not eat or drink anything before being taken to jail. He was handcuffed and transported to jail in the same condition as when arrested (Tr. pp. 149–150). An officer seized Headdress' pants and shoes that were in plain view (Tr. p. 150). At the jail, Headdress was processed. He remained at the jail. Two Bulls did not see anyone give Headdress water or food (Tr. pp. 154–155). He may have been fed when Captain Russell returned from Salt Lake City (Tr. p. 155). When Headdress' shoes and pants were taken, Officer Cuch said there appeared to be blood stains on the shoes (Tr. p. 156). Two Bulls observed the stains. At the jail, Headdress was apparently clothed in an orange jumpsuit. The interview with Headdress was not tape recorded. During the interview, Headdress did not ask to speak with his family. No phone call was given to him but he did not ask Two Bulls for a call (Tr. p. 161). Headdress' mother, Nancy Poowegup, requested to see him but was not permitted to see him before his interview at 8:08 p.m. (Tr. p. 161).

At the scene where the deceased body was found, Lieutenant Two Bulls did not examine the body. At that time he had a discussion with Ms. Ice, to get the facts. Two Bulls was told by Ice that Officer Mountain Lion had

advised Ankerpont of his rights and that Ice had told Ankerpont to tell the truth (Tr. p. 166). Ankerpont seemed intoxicated and he apparently said he'd been drinking (Tr. p. 167). That is why Two Bulls performed the Nystagmus test and determined to arrest Ankerpont (Tr. pp. 167–168). Ankerpont was arrested for intoxication under the Ute Tribal Code. Ankerpont was taken to jail and placed in an "detox" cell. He went to sleep (Tr. p. 170).

When Lieutenant Two Bulls arrested Headdress, his clothes were next to his bed as though they had been taken off when he went to bed (Tr. p. 172). At about 3:00 p.m. Captain Reynolds asked if either Ankerpont or Headdress had been fed. Two Bulls could not say yes or no and Reynolds said he would check on it (Tr. p. 174). Reynolds later said he made sure the defendants were fed (Id). Neither Headdress or Ankerpont asked to make a phone call although phones were available. Headdress was not quite 22 years old (DOB December 30, 1973) (Tr. p. 175). Ankerpont was also an adult (Tr. p. 176). The alcohol/breath test performed on Ankerpont was an intoxilyzer test. It was performed at 9:19 a.m. and the results were .012 (Tr. p. 178). Before Ankerpont was arrested, Two Bulls noted large patches of blood on Ankerpont's pants (Tr. p. 181).

When Two Bulls arrested Headdress he was told he was being arrested for a serious federal crime, which Two Bulls considered to be murder. While Headdress was taken to the Fort Duchesne Jail, because of how Headaddress was dressed, the vehicle heater was turned up to high (Tr. pp. 184–185). Headdress was given an orange jumpsuit and shoes.

The distance from Fort Duchesne to Salt Lake City, where Agent McPheters was when he was first contacted by Two Bulls, is 160 miles (Tr. p. 187). The travel time is about three hours (Tr. p. 188). Two Bulls first saw Agent McPheters at Fort Duchesne sometime between 2:00 p.m. and 6:00 p.m.

Agent McPheters made some arrangements to take defendants before Magistrate Judge Nash[4] by 8:00 a.m. the following day (Tr. p. 192). There was no tribal judge available at the time. No effort was made to contact them. The cells where defendants were confined had a sink, toilet, running water and heat from a central system (Tr. pp. 192–194). The cells were isolated from each other (Tr. pp. 195–196).

Two Bulls believed he had enough probable cause to arrest Ankerpont on murder charges but played it safe and arrested him on the tribal charge. The following morning federal warrants were obtained. They were served at 9:00 a.m. the morning of December 2, 1995 at the Uintah County Sheriff's Department (Tr. p. 197). The magistrate judge was not available and defendants were left at the Uintah County Jail (Tr. pp. 198–200).

Special Agent Samuel M. McPheters, FBI, testified that he is the resident FBI Agent in Vernal, Utah (Tr. p. 207). On December 1, 1995 he was in Salt Lake City for computer training (Tr. p. 208). At about 8:30 a.m. to 8:45 a.m. he received a call from his supervisor about a homicide on the Ute Indian Reservation (Tr. pp. 208–209). He left Salt Lake City for the reservation at 9:15 a.m. White Rocks Canyon, where the deceased was, is 10 to 15 miles beyond Fort Duchesne. He traveled with red light all the way and made it in two hours and arrived around 11:15 a.m. to 11:30 a.m. He first had to determine if the offense was on Indian land. He also had to get a serology unit from the Utah Crime Laboratory and to arrange for an autopsy. The United States Attorney was contacted (Tr. pp. 210–211).[5] McPheters arrived at the location of the body at about 11:30 a.m. and at 12:30 p.m. went to the BIA police department at Fort Duchesne and contacted Lieutenant Two Bulls. Two Bulls informed McPheters about what had occurred. McPheters first interviewed Kelly Ankerpont from 1:50 p.m. to 3:17 p.m. A second conversation was had with Ankerpont at 3:40 p.m. to 3:45 p.m. (Tr. pp. 213–214). During this

---

4. Judge Nash was located in Vernal, Utah. Rule 201 F.R.E.

5. The jurisdiction problems have been somewhat complicated by the Supreme Court's decision in

*Hagen v. Utah*, 510 U.S. 399, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994). See also *United States v. Cuch*, 79 F.3d 987 (10th Cir.1996) (Tr. p. 211).

time contact was had with the United States Attorney's office (Id.). The Agent interviewed the juvenile who was involved from 4:00 p.m. to 5:00 p.m. The juvenile's mother was also interviewed (Tr. pp. 214–215). At 5:00 p.m. McPheters became aware that there was another crime scene in the Little Water area (Tr. p. 215). He advised other officers to secure the scene. He then transported the juvenile, at Captain Reynolds' request, to the juvenile detention center in Vernal. He also intended to get a search warrant for the vehicle (Tr. p. 215). The juvenile was fed at a McDonald's in Vernal. McPheters had to go back to Fort Duchesne because the search warrants had been sent to Fort Duchesne to Investigator Tom's office (Tr. p. 216). McPheters then interviewed Headdress at 8:08 p.m. and then Ankerpont and then his mother. This was around 9:30 p.m. (Tr. pp. 216–217). He then went to the other crime scene to see that everything was being collected. A search warrant for the Ankerpont vehicle was received at 11:30 p.m. and the vehicle searched (Tr. p. 217). The warrant was issued by Magistrate Judge Nash at about 12:30 a.m. on December 2, 1995 (Tr. p. 218). Criminal complaints for the defendants were also obtained on December 2, 1995 at about 7:30 to 8:00 a.m. Headdress and Ankerpont were arrested on the federal complaints at about 9:00 a.m. on December 2, 1995 (Tr. p. 219). McPheters described the road and the area between the various points from where Tapoof's body was found and other places relevant to the investigation (Tr. pp. 219–222). The water flow in the creek bed where Tapoof's body was found was minimal. The second crime scene was on Turkey Trail Road (Id.).

It is FBI protocol in transporting prisoners to have two agents per prisoner, however, McPheters was the only agent in the Vernal area of Utah. The defendants and the juvenile were not transported from Vernal until the following Monday. The discovery and apparent commission of the offense was on Friday, as was each defendants' arrest (Tr. pp. 228–229). At the time of transportation on Monday, two BIA officers transported Ankerpont and Headdress and McPheters transported the juvenile (Tr. p.

229). They were transported to Salt Lake City for an initial court appearance (Tr. p. 230).

The second crime scene was identified during the interview with the juvenile at between 4:00–5:00 p.m. on December 1, 1996. The crime scene was on Turkey Trail Road. The agent went to the area and observed a drag site with patches of blood mixed with the dirt (Tr. pp. 231–232). The marks were measured on December 11, 1995 and measured just under ½ mile or 2,234 feet (Tr. p. 233). McPheters observed the bank and rocks of the creek area where the deceased's body was found and observed blood on the rocks and boulders. McPheters arrived at the creek where deceased's body was found at about 11:30 a.m. on December 1, 1995. He was told by a Realtor for BIA Realty at Fort Duchesne that the area was in on Indian land (Tr. pp. 235–237). The Uintah County Sheriff's office had helped process the crime scene and advised McPheters of what they did. He then went to Fort Duchesne and conferred with Lieutenant Two Bulls who told him what defendant Ankerpont had told Officer Mountain Lion earlier (Tr. p. 237). At that point McPheters did not believe he had enough information to seek a criminal complaint on defendants and the juvenile (Tr. p. 238). McPheters did not indicate what he meant by that conclusion. He wanted to interview the subjects (Id.). Ankerpont was first approached for an interview because he had given information earlier. He was interviewed at Fort Duchesne. He was 21 years old and had a high school education. He was not intoxicated or impaired at the time (Tr. pp. 239–240). The first interview was at 1:50 p.m. McPheters knew when he spoke to Ankerpont that he had been detained since around 7:00 a.m. The interview ended at 3:17 p.m. During the interview Ankerpont did not evidence any physical discomfort. BIA investigator Anselm Tom was also present (Tr. p. 241). Investigator Tom gave Ankerpont a *Miranda* warning and a waiver form was voluntarily executed. It was explained to Ankerpont in detail. Ankerpont said he understood English, he understood the waiver and he executed the waiver (Exh. 5, (Tr. p.

p. 242)). The interview was in the squad room. There were no bars on the windows (Tr. p. 244). No promises were made or tricks used. Ankerpont was not handcuffed. No weapon was displayed (Tr. pp. 244–245). Ankerpont was normal and cooperative. Ankerpont gave an incriminating statement as to the killing of Tapoof (Tr. pp. 246–250). The interview ended at 3:17 p.m. Thereafter, McPheters determined there was another person, Arrow Wisseup, who may have been involved and decided to reinterview Ankerpont on this matter (Tr. p. 251).

The second interview of Ankerpont began at 3:40 p.m. and lasted only five minutes until 3:45 p.m. At that time, Ankerpont was again given *Miranda* advice and Ankerpont said he understood his rights and would speak. He executed a written waiver (Tr. pp. 251–253, Exhibit 6). Ankerpont's demeanor was normal and he was not threatened. He made incriminating statements (Tr. p. 254). At no time during either interview did Ankerpont invoke a right to silence (Tr. p. 255).

McPheters then spoke to the juvenile who was involved (Tr. p. 256). The interview began at 4:01 p.m. The juvenile gave a statement.[6] It was from the juvenile's statement that McPheters learned there was a second crime scene in the Turkey Trail area (Tr. p. 259). The juvenile's statement more heavily implicated Ankerpont (Tr. pp. 260–264). The interview with the juvenile ended at 5:00 p.m. (Id). At that time McPheters felt he had a complete and accurate picture of what occurred and for a complaint. He advised the BIA officers to go the Turkey Trail Road location and secure the crime scene (Tr. p. 264). There was a federal magistrate judge in Vernal, but he could not be utilized because he could not appoint counsel (Tr. p. 265).[7] McPheters believed the Ute Tribal Court had no authority (Tr. p. 265). McPheters went to Vernal to put the juvenile in detention and to obtain a search warrant for the vehicle. However, the warrant papers had not been faxed to him and McPheters had to return to Fort Duchesne where they were sent (Tr. pp. 266–267). This was about 7:00 or 8:00 p.m. At 8:08

p.m. he took the opportunity to interview defendant Headdress (Tr. p. 267).

Headdress was interviewed by McPheters with Lieutenant Two Bulls also being present. Two Bulls advised Headdress of his *Miranda* rights. Headdress indicated he understood his rights and would speak with the agents. A form advising Headdress of his rights and a waiver was signed (Tr. p. 268). Headdress was not under the influence of alcohol and appeared to be in ordinary physical shape. Headdress is a high school graduate and was 22 years old. He didn't ask for a rest break or for water. Nothing was said to Headdress that was untruthful, no promises were made, and Headdress was not handcuffed (Tr. pp. 269–271). No weapons were displayed. The interview lasted from 8:08 p.m. to 8:58 p.m. or 8:40 p.m. Headdress' demeanor was normal and he indicated a willingness to talk and that did not change during the interview (Tr. pp. 271–272). Headdress made an incriminating statement (Tr. pp. 272–275). Headdress is 6'3" tall and weighs 260 pounds. Ankerpont is 5'7" and weighs 185 pounds (Id.).

The last interview with Ankerpont began at 8:58 p.m. Two Bulls and McPheters, along with Ankerpont were present (Tr. p. 276). Ankerpont was again advised of his rights and executed a waiver of the rights at 8:59 p.m. Ankerpont made an incriminating statement (Tr. p. 277). He gave a signed statement. The interview concluded at 9:30 p.m. (Id.). McPheters interviewed Ankerpont's mother, Raquel Ice at about 9:30 p.m. and then went to Turkey Trail Road crime scene to make sure it was secure (Tr. p. 278). About midnight a search warrant for the Ankerpont/Ice vehicle was obtained and it was searched after midnight. The vehicle is a 1969 Chevy Caprice Classic. There were several blood splatters throughout the vehicle (Tr. pp. 278–281). The search of the vehicle was completed on the morning of December 2, 1995 at 2:07 a.m. (Tr. p. 281).

At 9:15 or 9:17 on December 2, McPheters placed Ankerpont and Headdress under federal arrest pursuant to an arrest warrant and

---

6. The statement of the juvenile is not a part of this report and recommendation.

7. The defendants would have to be transported to Salt Lake City.

a complaint issued from federal court (Tr. p. 287). They were taken to the Uintah County Jail. They were transported to the magistrate judge in Salt Lake City, on Monday (Tr. p. 282). Defendant Charles Headdress gave a written statement to McPheters (Exhibit 3–A).

McPheters cannot recall if during the interview with Headdress he told him what the other suspects had said (Tr. p. 284). When McPheters arrived at the crime scene at the bridge at Elk Horn loop there were BIA and Uintah County officers present doing various things (Tr. p. 285). The victim's body had been taken to the mortuary at Roosevelt, Utah (Tr. p. 286). The body was transported by the morticians first to the mortuary then to the medical examiner's office. McPheters was aware of Headdress' arrest by a BIA officer at 11:30 a.m. Before the Ankerpont/Ice vehicle was searched, it was in the facilities management building at Fort Duchesne (Tr. p. 288). A criminal complaint for each defendant was obtained on December 2, 1995 between 7:30 a.m. to 8:30 a.m.[8] The defendants appeared in Salt Lake City on December 4, 1995 for initial presentment (File Entry # 2). An amended complaint was filed on December 6, 1996. There were three separate interviews by McPheters with Ankerpont, one with Headdress and one with the juvenile on December 1, 1995 (Tr. p. 290). The defendants were not taken before a magistrate judge on December 1 or 2, 1996 (Tr. p. 291). The initial appearance was on December 4, 1995 (Id.) at 1:30 p.m.

A shock absorber was found on Turkey Trail Road sometime after the initial search of that crime scene area (Tr. p. 294). McPheters did not provide food or water to any defendant during the interviews (Tr. p. 295). None of the interviews were videotaped. Neither defendant had scratches or marks on their persons which the agent observed (Tr. p. 298). When McPheters got to the Turkey Trail Road crime scene, BIA investigator Tom and other officers were already present (Tr. p. 302). There were blood spatterings in the dirt that had to be picked up, they were throughout the course of the drag marks (Id.). When McPheters first went to the Elk Horn Bridge crime scene other officers were also present (Tr. pp. 304–305). Detective Wayne Hallenbeck, Uintah County Sheriff's office, took measurements concerning the body and the blood splatters (Tr. p. 306). Before each interview of Ankerpont at Fort Duchesne he was given a preinterrogation warning. Advice and waiver forms were used (Tr. p. 307). At the first interview at 1:50 p.m. BIA officer Anselm Tom gave Ankerpont standard advice forms to read, he read them and indicated he understood and executed the waiver. Ankerpont reads English and understood the waiver. Ankerpont has a twelfth grade education (Tr. p. 308). The second interview was at 3:42 p.m. and Agent Duchesne again followed the same advice process. The waiver form was read to Ankerpont who said he understood and was willing to speak without a lawyer. Ankerpont executed a waiver of rights at 3:42 p.m. The last interview was at 8:59 p.m. and Lieutenant Two Bulls furnished Ankerpont with waiver and rights forms. His rights were read, he acknowledged he understood and executed the waiver of rights form (Tr. p. 308).

The search of the vehicle revealed tremendous amounts of blood in the trunk of the vehicle and a shoe lace was also found (Tr. p. 310–318). McPheters was aware of Headdress' arrest when McPheters arrived from Salt Lake City (Tr. p. 311). He believed he was under arrest for homicide under the Major Crimes Act (Tr. p. 312). McPheters also believed Ankerpont had been arrested for homicide (18 U.S.C. § 1153) (Tr. p. 312). McPheters was aware of defendants' arrests by 11:30 a.m. or 12:00 noon.

Bureau of Indian Affairs Criminal Investigator Anselm C. Tom also testified (Tr. p. 320). He was notified of the murder at 7:30 a.m. on December 1, 1995. He arrived at the Elk Horn crime scene at 8:00 a.m. He took charge of the scene until McPheters arrived (Id.). He participated in the interviews of Ankerpont and Headdress with Agent

---

8. The court record reflects a complaint was issued by Judge Nash on December 2, 1995 (File Entry # 1).

McPheters (Tr. p. 323). At the first interview of Ankerpont at about 1:50 p.m. he explained to Ankerpont his preinterrogation rights and determined Ankerpont had completed the twelfth grade at Union High School. The rights form was read to Ankerpont and explained line by line and Ankerpont signed the waiver form (Tr. p. 325). The same procedure was followed at the second interview (Id.). Ankerpont did not request a lawyer or to remain silent (Tr. p. 326). Tom did not feed either defendant, that was not his responsibility, that function was the responsibility of the jail (Tr. p. 328). When Tom arrived at the Elk Horn Bridge, Officer Mountain Lion was in charge and Ankerpont and Ice were present.

Captain Edward Reynolds is the police captain at the Uintah and Ouray Agency at Fort Duchesne (Tr. p. 330). His office is separate from the activity of BIA Investigator Tom. On December 1, 1996 he was in Salt Lake City at a trial. He was released from the trial at noon and had learned of the homicide at about 8:30 a.m. when informed by an FBI agent (Tr. pp. 331–332). He also spoke to Lieutenant Two Bulls. Reynolds arrived back at Fort Duchesne at about 2:45 p.m. On arrival he spoke to Two Bulls who informed Reynolds of what had occurred (Tr. p. 332). His first actions were to take care of the juvenile (Tr. p. 333). An interview of Ankerpont was taking place by McPheters and Tom (Tr. p. 333). Ankerpont had been held in a drunk tank with a bench, sink with a water spout, and toilet. Headdress was in a security cell with sink and toilet (Tr. p. 334). Reynolds went to the crime scene and made arrangements to have the Ankerpont/Ice vehicle towed. The State Crime Laboratory had finished with it (Tr. p. 335). The vehicle was taken to the facility management shop at Fort Duchesne. The building is kept locked and only the custodian has a key. The vehicle was secured. It was processed by the FBI later. On December 7, 1995 Captain Reynolds spoke to Agent McPheters and Assistant United States Attorney Viti because Raquel Ice, the vehicle owner, wanted to get into it (Tr. p. 337). Eventually Ms. Ice was allowed to obtain items from the vehicle. She needed to get some bills that needed to be paid (Tr. p. 337).

Reynolds was present and Ms. Ice did not get inside the vehicle, Captain Reynolds opened the glove box, in the vehicle, and also got items from the visor area. The vehicle and building were locked when Reynolds got the items. A team of defense investigators and counsel was allowed to examine the vehicle on December 29, 1995. Reynolds was present and supervised. On January 18, 1996 Ms. Ice wanted to get her glasses from the vehicle. Reynolds got the glasses out of the vehicle and gave them to Ice (Tr. p. 339). The vehicle was locked and Captain Russell had the keys.

On December 3 or 4, 1995, Reynolds went to the Turkey Trail Road crime site with members of the deceased family (Tr. pp. 340–341). This was when a shock absorber was found (Tr. p. 341).

Prisoners who are first brought to the Fort Duchesne jail and who are intoxicated are put in detox and not fed. After eight hour in detox they are put in the general population and fed. (Tr. p. 343). A cook arrives at the jail at 8:00 a.m. and leaves at 4:30 p.m. and there is a kitchen in the jail along with food supplies. Lunch is served between 12:00 noon and 1:00 p.m. Dinner is served between 4:00 p.m. and 5:00 p.m. and the cook keeps a log of persons served (Tr. pp. 343–344). Reynolds had told his dispatcher to make sure Ankerpont and Headdress were fed. The defendants were kept in separate cells. If they had asked to make a telephone call they would have been allowed to do so (Tr. p. 346). No request was made by either defendant to make a call.

The tribal court is closed on Fridays, but for a federal crime individuals are not taken to the tribal court, they are taken into Salt Lake City (Tr. p. 348). There is a tape recorder at the jail and a video camera (Tr. p. 351). Only one person has a key to the facilities management shop, where the vehicle was stored, that is Dallas Perank (Tr. p. 352). It is only open when he is present. It was when Reynolds found out that neither defendant had been fed lunch that he directed his dispatcher to make arrangements for them to be fed. (Tr. p. 356). Reynolds also went back and spoke to a trustee about

feeding the defendants (Tr. p. 357). He saw some frozen chicken brought out. Officer Blackbird periodically checked on the premises (Tr. p. 360). Defendants were kept separate because of their violent crime (Id.). Ankerpont was charged with intoxication but under investigation for the homicide (Tr. p. 361). The applicable Ute Tribal Code provision for Ankerpont's arrest was § 13–4–106. Reynolds did not know if the two defendants were actually fed (Tr. p. 362).

The purpose of going to the Turkey Trail Road with members of the deceased's family was to remove deceased's blood which was a part of tribal custom to bury such matter (Tr. pp. 363–364). When the FBI interviewed the defendants they were sober (Tr. p. 366).

Defendant Charles Headdress Jr. testified (Tr. p. 371). At the time of the offense on December 1, 1995 he was living with his grandmother Betty Poowegup on the Uintah Ouray reservation. He had eaten the night before at about 5:00 p.m. He was not fed following his arrest at the Fort Duchesne jail. He was fed when he was moved to the jail in Vernal on December 2, 1995 (Tr. p. 372). Headdress was 21 at the time and a high school graduate. He speaks and writes English and gave a written affidavit in his own handwriting to Agent McPheters (Tr. pp. 373–374). Headdress did not ask for food while at the jail or indicate any discomfort. The sink in his cell didn't work. He did not ask to use the telephone to speak to family or a lawyer (Tr. pp. 375–376).

Headdress spoke to Agent McPheters. Headdress signed a waiver of his rights which were given to him. He said he would speak to McPheters (Tr. pp. 376–377). There were no tricks. "So that what you told them on December 1st was purely voluntary, wasn't it?" "A. Yes" (Tr. pp. 377 lines 13–15). He did not indicate he was hungry or thirsty and he knew the inquiry involved the murder of Tilford Tapoof (Tr. p. 377). Headdress was not uncomfortable at the time. Headdress asked for a cup of water after the interview and it was given to him (Tr. p. 379).

Gayla Jack Magpie testified that she lived at Fort Duchesne and was confined at the jail on December 1, 1995 (Tr. p. 383). She was released from jail on December 8, 1995. She did cooking and serving at the jail at the time. She did not feed the defendants (Tr. p. 384). Other trustees were also responsible for feeding prisoners. Reynolds only asked her to feed the juvenile (Tr. p. 385). She was only responsible for feeding female prisoners (Tr. p. 386).

Based on the above evidence the court makes the following:

### Findings of Fact

1. On December 1, 1996 defendant Royja Kelly Ankerpont returned home in his mother's car at around 7:00 a.m. His mother Raquel Ice questioned him as to what he had done. Ankerpont told her that there had been a fight and a juvenile and defendant Charles Headdress had thrown the victim, Tilford Tapoof, in the river on Elk Horn Loop Road near the bridge and he had taken them home. Ms. Ice wanted defendant Ankerpont to show her where it occurred. They got into Ms. Ice's vehicle, the vehicle was the one Ankerpont and the others had been in the night before. At around 7:20 a.m. while driving to the place where the victim's body was found, Ice and Ankerpont came across Bureau of Indian Affairs (BIA) and Ute Tribal Officer Jay Mountain Lion, who was related to Ankerpont and Ice. They stopped Mountain Lion who was on routine patrol on Elk Horn Loop Road. Ms. Ice said there had been an assault and pointed to the east. Ankerpont said "they" threw Tilford Tapoof in the river. Mountain Lion remained in his car and Ice and Ankerpont, who was driving, drove to the scene. Mountain Lion followed in his vehicle. They reached a bridge and culvert and they all got out of their vehicles without direction to do so. Ankerpont pointed underneath the culvert where Mountain Lion saw a body without a shirt laying face down in the stream. Mountain Lion and Ankerpont went down near the body. There appeared to be blood on the rocks. Mountain Lion felt the body for a pulse. There was none, although the body was still warm. Mountain Lion did not otherwise disturb the body nor was it touched by Ankerpont. Eventually the body was removed by other

persons to take to a mortuary and the medical examiner.

2. Raquel Ice had instructed her son to tell the truth before they encountered Office Mountain Lion. After Mountain Lion had examined the body for a pulse, he had Ankerpont go back up to the bridge road the way he had come down to the stream in order to preserve the crime scene. After returning to the road the officer noticed a red area underneath the Ankerpont/Ice vehicle which the officer believed was blood. Ankerpont volunteered that he didn't have anything to do with it and moved the vehicle. Mountain Lion then called his supervisor Lieutenant Two Bulls. Two Bulls advised Mountain Lion to secure the area and wait for other units. Ms. Ice told Mountain Lion that Ankerpont had told Ice that Headdress and a juvenile beat Tapoof and threw him in the river. Ankerpont said he drove the two others home after the incident. Ice was crying and Mountain Lion tried to comfort her. Ankerpont was standing close by. He was not arrested, handcuffed or in custody.

3. Officer Mountain Lion offered Ms. Ice and defendant Ankerpont blankets to keep warm, which they put about their bodies. Mountain Lion asked Ankerpont if he would give an affidavit about what happened and he agreed. Ankerpont had not been arrested or restrained. Officer Mountain Lion read Ankerpont his preinterrogation rights under *Miranda* from a notebook. The officer asked Ankerpont if he understood his rights and he replied "yes." Ankerpont's mother was next to him. Mountain Lion gave Ankerpont the affidavit form and asked him to write out what happened. Mountain Lion asked Ankerpont if he would like to get into the patrol car where he would be more comfortable and Ankerpont walked to the patrol car, got in and wrote out a statement. He left the statement in the patrol vehicle which Mountain Lion retrieved. Ankerpont and his mother then had a cigarette.

4. At about the time Ankerpont was writing out his statement, Lieutenant Two Bulls a BIA officer with the Ute Tribal Police, arrived at about 7:58 a.m. He spoke to Officer Mountain Lion and then approached Ankerpont. Although Mountain Lion knew Ankerpont had been drinking he did not think he was intoxicated. However, Two Bulls went over to Ankerpont and spoke to him after examining Ankerpont's affidavit and also spoke with Ms. Ice about what Ankerpont had said had happened. Two Bulls asked Ankerpont if he had been advised of his rights and he said he had. Two Bulls asked Ankerpont what happened and Ankerpont said an argument occurred between a juvenile, Headdress and Tapoof and that Tapoof was assaulted and thrown in the river. Ankerpont said he took the juvenile and Headdress to their residences. This statement was made just outside Mountain Lion's vehicle. Two Bulls observed blood stains on Ankerpont's pants. He had an odor of alcohol about him, and although he was not falling or staggering, Ankerpont seemed intoxicated. Two Bulls had him perform a horizontal gaze nystagmus test. The test showed intoxication. Two Bulls arrested Ankerpont for public intoxication under the Ute Tribal Code for the Uintah Ouray Reservation. Ankerpont was transported to the jail at Fort Duchesne. This was about 8:09 a.m. Before Ankerpont was taken to jail, Ms. Ice spoke to him and said if what he told her was true, then everything would be alright.

5. At the Fort Duchesne Jail, Two Bulls asked Ankerpont if he wrote the statement he gave Officer Mountain Lion, Ankerpont said he did and that he stood by it. Ankerpont signed the affidavit as did Two Bulls. The defendant's name was put on the statement at the top by Two Bulls. No coercion, threats or duress of any kind was directed towards Ankerpont by Officers Mountain Lion or Two Bulls. Ankerpont was given an intoxilyzer test at the jail and it showed a blood alcohol concentration at .012 at 9:19 a.m. Ankerpont was put in the drunk tank and went to sleep.

6. Lieutenant Two Bulls left the police station and near White Rocks observed the deceased's brother in a vehicle and waived him over. Two Bulls informed the brother of the deceased's death and the brother requested to perform a religious rite over the body. Two Bulls had a conversation with Investigator Tom who instructed Two Bulls

to see that the deceased's hands were bagged. Two Bulls located the ambulance at Ridleyville that was taking the deceased's body to Roosevelt, Utah. The body was zipped up in a body bag and strapped on a body gurney. The deceased's brother conducted a ceremony over the body. The brother held a sprig of cedar, which was smoking and waived it over the body with an Eagle feather. He also blew into an Eagle bone pipe whistle. The body was never touched or interfered with. The deceased's hands were not bagged and the body was taken to the mortuary and then to the State Medical Examiner. There is no indication the failure to bag the deceased's hands resulted in the loss of any evidence. There is no evidence that there was any conduct with respect to deceased's body that could have or did impede the investigation or the efficacy of the evidence in this case. No evidence was lost or destroyed.

7. At 11:20 a.m. Officers Two Bulls, Mountain Lion and Cuch went to the residence of Charles Headdress. He lived at the home of his grandmother, Betty Poowegup. They went to the residence to arrest Headdress. Two Bulls knocked on the door and Betty Poowegup came to the door. They asked if Headdress lived there and were told he did. Two Bulls explained that the officers were there to arrest Headdress for a serious federal crime. They asked for permission to enter the premises which Poowegup granted. Poowegup said Headdress was asleep in his bedroom and she took the officers to the room where Headdress was asleep. He was awakened and arrested for murder and handcuffed. He was given a *Miranda* warning but was not questioned. Headdress was taken to the Fort Duchesne jail at 11:27 a.m. A few booking questions about tribal membership were asked. Clothing in plain view was seized. At the jail Headdress was given prison clothing and shoes and placed in a cell.

8. When deceased's body was located by Officer Mountain Lion, communications were made to various police and investigative personnel. BIA investigator Anselm Tom was notified and he went to the Elk Horn Road (White Rocks cutoff) crime scene. Captain Reynolds of the tribal police was notified, but

he was in a rape trial in Salt Lake City and could not start back to the reservation until noon. The distance from Salt Lake City to Fort Duchesne is 160 miles and the site where deceased's body was found is about 15 additional miles. FBI Special Agent Samuel M. McPheters is the resident agent in Vernal, Utah. He was contacted in Salt Lake City where he was at a training program and was told about the matter. This was between 8:30 and 8:45 a.m. He left for the reservation at 9:15 a.m. with emergency equipment operating and arrived at Fort Duchesne at between 11:15 a.m. and 11:30 a.m. He had to first determine if the murder was within Indian Country and arrange for a serology unit from the Utah Crime Laboratory and for an autopsy. He then went to the crime scene at 11:30 a.m. Others from the BIA and Uintah County Sheriff's office were at the scene assisting in the investigation. McPheters went back to Fort Duchesne and spoke to Lieutenant Two Bulls who provided McPheters with information as to what had occurred.

9. McPheters then interviewed Ankerpont from 1:50 pm. to 3:17 p.m. A second interview was had with Ankerpont from 3:40 p.m. to 3:45 p.m. Ankerpont was first approached for an interview because of the information he had provided earlier. The defendant Ankerpont is a high school graduate and was 21 years old. At the time of the afternoon interviews he was not intoxicated or impaired. During the interviews Ankerpont did not express any discomfort. Agent McPheters and Investigator Tom were present. Tom gave Ankerpont a full *Miranda* warning before the 1:50 p.m. interview and Ankerpont executed a written waiver. The interviews were in the police squad room. No tricks, duress, or coercion of any kind was used and Ankerpont was not handcuffed. No weapon was displayed. Ankerpont was normal and cooperative and he gave an incriminating statement. Thereafter, McPheters was concerned that another person may have been involved and decided to reinterview Ankerpont. The second interview began at 3:40 p.m. and lasted only for five minutes. Ankerpont was again given a *Miranda* warning which he said he understood and would speak. He executed a written

waiver. He was not threatened and his behavior was normal. He did not invoke a right to silence and made an incriminatory statement. Thereafter, McPheters interviewed the juvenile involved and determined there was a second crime scene in the Turkey Trail area. This was at 5:00 p.m. and McPheters, at that point, felt he had complete and accurate information on which to base a complaint. McPheters was aware that there was a federal magistrate judge in Vernal but the judge could not appoint counsel and an order by this court required defendants to be transported to Salt Lake City for initial appearance, appointment of counsel and other matters. The Tribal Court had no jurisdiction over a federal offense. McPheters believed he did not have personnel to transport two prisoners to Salt Lake City under FBI standards. McPheters took the juvenile to Vernal for detention in a state juvenile detention facility. He also intended to get a search warrant for the vehicle from Judge Nash, the federal magistrate judge in Vernal, if the papers were faxed from Salt Lake City. However, he could not obtain a warrant because the necessary papers were not received. McPheters returned to Fort Duchesne. He made no effort to take Ankerpont or Headdress to Salt Lake City to a federal magistrate judge at that location.

10. Agent McPheters and Lieutenant Two Bulls then interviewed defendant Headdress at the Fort Duchesne jail in the interview room at 8:08 p.m. The interview ended at 8:40 p.m. Headdress was willing to talk and he maintained that attitude throughout the interview. Lieutenant Two Bulls advised Headdress of his *Miranda* rights which he indicated he understood. He stated he would speak with the officers. Headdress executed an advice of rights and waiver form. At that time Headdress was not under the influence of alcohol and appeared to McPheters to be in a normal condition. Headdress is a high school graduate and was 22 years old. Headdress, since his arrest, had not asked for food, water, a telephone call, or to speak to his family. He had not been fed or had a drink of water since his arrest, but this had no effect in his decision to speak. Prisoners who are intoxicated are not fed at the jail until they are sober. Headdress was

under the influence when arrested. No coercion, threat, duress or force was used or intimated. No promises or offer of benefit was discussed. He was not handcuffed and the atmosphere was not coercive. He was not uncomfortable. At one point the interview was interrupted to obtain Headdress' glasses. His mother, Nancy Poowegup, had attempted to contact him earlier, but she was not allowed to speak to him. There is no evidence Headdress knew of his mother's efforts. Headdress made a statement. Headdress has admitted his statement which he gave the officers was voluntary. At the end of the session at 8:40 p.m., Headdress asked for a cup of water which was given to him.

11. Following the interview with Headdress, Agent McPheters interviewed Ankerpont at 8:58 p.m. This was the third interview of Ankerpont by Agent McPheters. Ankerpont was again advised of his preinterrogation rights and at 8:59 p.m. executed a written advice and waiver of rights. Thereafter Ankerpont made an incriminating statement. It was a signed written statement. The interview concluded at 9:30 p.m. Lieutenant Two Bulls was present at the interview. Ankerpont was not under the influence of an intoxicant and did not ask for food, water, or cigarettes. No force, coercion, threat or promises was employed and Ankerpont's statement was voluntary.

12. Thereafter, McPheters went to the Turkey Trail crime scene. He also obtained a search warrant for the Ankerpont/Ice vehicle that had been impounded. The vehicle was searched after midnight and the search was completed at 2:01 a.m. December 2, 1995. The vehicle was kept at the Ute Tribe Facilities Management Building at Fort Duchesne. Only the facilities' custodian, Dallas Perank, had access to the vehicle. Subsequently, on December 7, 1995 Captain Reynolds entered the vehicle to retrieve some bills that Raquel Ice needed to pay. They were given to Ms. Ice. Nothing else was disturbed. The vehicle was locked. Thereafter, Captain Reynolds obtained some glasses of Raquel Ice from the vehicle. There is no evidence of any intrusion or interference with the vehicle until December 29, 1995 when defense counsel and investigators were al-

lowed to examine the vehicle under the oversight of Captain Reynolds. No mishandling or interference with the vehicle occurred. No evidentiary feature of the vehicle was lost or contaminated.

13. On December 2, 1995, at 9:15 to 9:17 a.m. defendants Ankerpont and Headdress were arrested on a federal murder charge on a complaint issued by Magistrate Judge Nash. Ankerpont had not previously been arrested on a federal charge. Defendants were taken to the Uintah County Jail until they were transported to Salt Lake City for their initial appearance before a magistrate judge on December 4, 1995. Neither defendant was interrogated while at the Uintah County Jail in Vernal.

*Discussion*

The defendant Charles Headdress made a motion to dismiss the indictment for destruction of evidence or to suppress evidence taken at the crime scene (File Entry # 43). The defendant contended there was a failure to preserve evidence, the body of the deceased was disturbed by deceased family, and that codefendant Ankerpont's vehicle was not properly stored and persons had access to the vehicle.

■ There is not a scintilla of evidence to support the claims of Headdress. The deceased body was not touched by Ankerpont and only briefly by Officer Mountain Lion at the river to check for a pulse before it was taken by technicians to a mortuary and then to the Medical Examiner. There is no evidence of any physical disturbance of the body. Although the deceased's hands were not bagged, there is no showing that this effected the evidentiary aspects of deceased's body to any degree. While the body was being transported in a closed body bag, a family member of the deceased performed a religious ritual over the body, but the body was not touched. This action did not physically effect the body or deprive Headdress of evidence.

The evidence shows the crime scenes were carefully protected by BIA, county and federal officers. The defendant Headdress has shown nothing to the contrary. Headdress has not shown or articulated how there was a loss of evidence or how he was affected.

There has been no access to the Ankerpont/Ice vehicle by others except by Captain Reynolds and defense team members. There is no evidence that the vehicle has been disturbed or contaminated in any manner or the chain of evidence intruded upon. The vehicle was kept in a relatively secure storage facility. There has been no contamination or loss of evidence.

■ A dismissal of the indictment for destruction or failure to preserve evidence is a rare occurrence. In *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) the Supreme Court refused to find an obligation on the part of a state to preserve a breath sample for use in a driving while intoxicated prosecution. In this case, Headdress has not shown that any evidence of value to him was held, lost or destroyed or contaminated. To prevail in such a motion Headdress would have to identify and demonstrate the materiality of the lost evidence. *United States v. Valenzuela–Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982); *Trombetta*, supra; *United States v. Richard*, 969 F.2d 849 (10th Cir.1992) (potentially useful and materially exculpatory standard is applicable). This has not been done.

In *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) the court held the failure of enforcement officers through mere negligence to preserve evidence that might have been helpful to the defendant did not violate due process. In *Youngblood*, supra, the court said:

The Due Process Clause of the Fourteenth Amendment, as interpreted in Brady, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in *Trombetta*, supra,

467 U.S., at 486, 104 S.Ct., at 2532, that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Part of it stems from our unwillingness to read the "fundamental fairness" requirement of the Due Process Clause, see *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941), as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

488 U.S. at pp. 57–58, 109 S.Ct. at p. 337.

In *United States v. Richard,* 969 F.2d 849 (10th Cir.1992) the defendant, who was charged with conspiracy to possess marijuana for distribution, claimed a denial of due process based on the destruction of the marijuana involved. The court found the evidence was only potentially useful and not materially exculpatory. Id. at p. 853. Therefore, bad faith had to be shown. None was shown. In this case, there is no showing of bad faith by law enforcement officers, no showing of loss or destruction of evidence and no showing that any evidence was lost that was either potentially useful or exculpatory. *United States v. Martinez,* 744 F.2d 76 (10th Cir.1984) (trial court erred in dismissing indictment because of destruction of evidence which was not clearly exculpatory).[9] The defendant bears the burden of proof of

showing the destruction of useful or exculpatory evidence. *United States v. Donaldson,* 915 F.2d 612, 614 (10th Cir.1990); *Bohl,* supra p. 913. Headdress has not met that burden. Headdress must also show bad faith. Id.; *United States v. Molina–Cuartas,* 952 F.2d 345, 349 (10th Cir.1991). This has not been shown. In *United States v. Parker,* 72 F.3d 1444 (10th Cir.1995) the defendant complained of an erased videotape of a vehicle search. The Court of Appeals found no basis for complaint. The court said:

Under the Due Process clause of the Fourteenth Amendment, the Supreme Court has developed " 'what might loosely be called the area of constitutionally guaranteed access to evidence.' " *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984) (quoting *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982)). The Court has specified that, to the extent the Constitution imposes a duty upon the government to preserve evidence, "that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense"—i.e., evidence that is constitutionally material. Id. at 488–89, 104 S.Ct. at 2533–34. To be constitutionally material, evidence must: (1) "possess an exculpatory value that was apparent [to the police] before the evidence was destroyed," and (2) "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. at 489, 104 S.Ct. at 2534. The mere possibility that lost or destroyed evidence could have exculpated a defendant is not sufficient to satisfy Trombetta's requirement that the exculpatory value be "apparent" to the police before destruction. *Arizona v. Youngblood,* 488 U.S. 51, 56 n., 109 S.Ct. 333, 336 n., 102 L.Ed.2d 281 (1988). Additionally, "if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was 'potentially useful' for the defense, then a defendant must show that the

9. In *United States v. Bohl,* 25 F.3d 904 (1994) the court dismissed an indictment where potentially exculpatory evidence was destroyed by the Gov-

ernment but the court found bad faith, Id. at p. 913, and no comparable available evidence. No such circumstance exists in this case.

government acted in bad faith in destroying the evidence." *Bohl,* 25 F.3d at 910 (citing *Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337). "[M]ere negligence on the government's part in failing to preserve such evidence is inadequate for a showing of bad faith."

72 F.3d at p. 1451.

Applying the above principles there is no merit to Headdress' motion to dismiss.

There was no contamination, distortion, or change in the evidence which would justify its exclusion. *United States v. Gay,* 774 F.2d 368 (10th Cir.1985); *United States v. Cardenas,* 864 F.2d 1528 (10th Cir.1989); *United States v. Washington,* 11 F.3d 1510 (10th Cir.1993). In addition, there is no basis for otherwise suppressing any evidence about the deceased, the vehicle, or other relevant physical evidence. See *Bohl,* supra. p. 914.

### Defendants' Motions To Suppress Confessions and Statements

#### Ankerpont—Miranda

■ The defendant Royja Kelly Ankerpont's motion to suppress his statements refers to his statements being "given after being in custody for eight hours, not adequately informed of his rights, and he claims that the statement was not voluntary" (File Entry # 66). The defendant Ankerpont's memorandum (File Entry # 67) contends Ankerpont was·questioned over a 12 hour period when he had not slept. No evidence supports the lack of sleep. In fact Ankerpont, after his arrest, was placed in a cell and did go to sleep. He has not offered evidence of lack or sleep or shown such to be the case. Further, Ankerpont was not continuously questioned. He was questioned for a short time by Officer Mountain Lion and Two Bulls between 7:30 and 8:15 a.m. He was questioned from 1:58 to 3:11 p.m. Then again at 3:40 p.m. for 5 minutes. The next interrogation was at 8:58 to 9:30 p.m. There were significant breaks between questioning. Ankerpont was not seriously under the influence of alcohol when he gave his written affidavit to Officer Mountain Lion and then a statement to Lieutenant Two Bulls shortly thereafter and on arrival at the Fort Du-

chesne jail. He was not under the influence of alcohol when questioned by Agent McPheters and witnessed at various times by Officer Two Bulls and investigator Anselm Tom.

#### Miranda Analysis

■ Ankerpont made six separate statements. The first was the affidavit given to Officer Mountain Lion at the Elk Horn Loop crime scene. This was preceded by a complete *Miranda* warning from a notebook which advice Ankerpont acknowledged he understood. See *United States v. Soria–Garcia,* 947 F.2d 900 (10th Cir.1991). Ankerpont was asked to give a written statement which he did. He wrote it out in the patrol vehicle and left it there. His actions were a clear waiver of his *Miranda* rights. *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *United States v. Eagan,* 965 F.2d 887 (10th Cir.1992); *United States v. Hernandez,* 93 F.3d 1493 (10th Cir. 1996). Before Two Bulls questioned Ankerpont a short time later when they were standing by the police vehicle, Two Bulls asked Ankerpont if he had been advised of his rights and he said he had. Two Bulls asked what happened and Ankerpont gave essentially the same statement he gave to Officer Mountain Lion.

■ Further, it is doubtful that Ankerpont was in custody for *Miranda* purposes when he gave his statements to Mountain Lion and then a short time while standing outside the patrol car when he spoke to Lieutenant Two Bulls. *United States v. Ritchie,* 35 F.3d 1477 (10th Cir.1994) (no *Miranda* warning required, defendant not in custody); *United States v. Guerrero–Hernandez,* 95 F.3d 983 (10th Cir.1996) (defendant not in custody for *Miranda* purposes merely because officers questioned him and he becomes a target of an investigation). See also *United States v. Ellison,* 791 F.2d 821, 823 (10th Cir.1986); *United States v. Robertson,* 19 F.3d 1318, 1321 (10th Cir.1994) (defendant not in custody at hospital); *United States v. Erekson,* 70 F.3d 1153 (10th Cir.1995) (no custody, defendant came to interview voluntarily). Here Ankerpont was not under arrest and had stopped the officer to tell the officer about

the murder. Objectively viewed, he was not in custody. *Stansbury v. California*, 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). Therefore, Ankerpont has no valid claim of a *Miranda* violation for his statements made at the river crime scene bridge.

Ankerpont's third statement was given to Two Bulls shortly after his arrest on arrival at the Fort Duchesne jail. This merely involved Two Bulls asking Ankerpont if he stood by his statement given to Officer Mountain Lion. Ankerpont said yes and signed the statement. Although Ankerpont was clearly in custody, he had been given a full *Miranda* warning a short time before by Officer Mountain Lion and the warning was still operative. Ankerpont's assurance that he stood by the statement and his signing the affidavit was a waiver of his *Miranda* rights. Ankerpont had been told by his mother that if what he said was true he had nothing to worry about and to tell the truth. The inquiry was casual and limited. See *United States v. Hack*, 782 F.2d 862, 888 (10th Cir. 1986) (waiver even though suspect shot in the mouth); *United States v. Eagan*, supra, (*Miranda* waiver valid in spite of emotional condition of suspect). There was no need to repeat the warnings in light of the earlier warning a short time before. *Wyrick v. Fields*, 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982); *United States v. Andaverde*, 64 F.3d 1305, 1313 (9th Cir.1995); *Guam v. Dela Pena*, 72 F.3d 767, 769 (9th Cir.1995); *United States v. Gardner*, 611 F.2d 770 (9th Cir.1980) (second warning not required); *United States v. Calhoun*, 49 F.3d 231 (6th Cir.1995). Ankerpont has no basis to challenge the third statement made to Two Bulls.

Ankerpont's fourth statement was to Agent McPheters at the Fort Duchesne jail at 1:50 p.m. The interview lasted until 3:17 p.m. Ankerpont was not intoxicated at the time.[10] Agent McPheters and BIA investigator Tom were present. Tom provided Ankerpont with a full *Miranda* warning, his second warning of the day. Ankerpont executed a written waiver of his *Miranda* rights. There is no evidence that Ankerpont

did not understand his rights nor was there any deficiency in the *Miranda* warnings or waiver of rights. There is no basis for complaint about a *Miranda* violation as to the 1:50 p.m. interrogation.

Because Agent McPheters had obtained some information that another individual may have been involved, Ankerpont was approached again at 3:40 p.m. This was the second interrogation of Ankerpont by Agent McPheters and the fifth interrogation of Ankerpont. At this session Ankerpont was again given a *Miranda* warning which he acknowledged he understood and said he would speak. Ankerpont again executed a written waiver. The interview lasted for five minutes. There is no evidence of any violation of *Miranda* standards as to this interview.

The sixth and last interview of Ankerpont, and the third interview of him by Agent McPheters, was at 8:58 p.m. at the Fort Duchesne jail. Defendant was again advised of his *Miranda* rights. This was the fourth time that day he was advised of his rights. Ankerpont again executed a written advice and waiver of rights form at 8:59 p.m. There is no evidence of any threat or impropriety within the *Miranda* standard. There was no request for silence or counsel. There is no evidence of police overreaching to obtain the waiver of rights and therefore no basis for a claim of violation of *Miranda* standards. *Colorado v. Connelly*, 479 U.S. 157, 167–171, 107 S.Ct. 515, 521–24, 93 L.Ed.2d 473 (1986).

Ankerpont's rights under *Miranda v. Arizona*, supra, were not violated. See *Duckworth v. Eagan*, 492 U.S. 195, 201–205, 109 S.Ct. 2875, 2879–2881, 106 L.Ed.2d 166 (1989); *United States v. Hernandez*, 93 F.3d 1493 (10th Cir.1996) (*Miranda* warning adequate and waiver of rights voluntary).

### Headdress Miranda

Defendant Headdress was interrogated only once by officers. He was arrested at his residence at about 11:20 a.m. on December 1, 1995. At that time he was given a *Miranda*

---

**10:** Given Ankerpont's blood alcohol level at the time of his arrest and arrival at the Fort Duchesne jail where he was tested, natural metabo- lism would have reduced the blood/alcohol level to zero. Rule 201, F.R.E.

warning but no interrogation took place and a statement was not made. Defendant Headdress was taken to the Fort Duchesne jail where he was kept.

At 8:08 p.m. he was taken from his cell to the interview room. Agent McPheters and Lieutenant Two Bulls were present. Two Bulls advised Headdress of his *Miranda* rights which he acknowledged he understood and stated he would speak with the officers. His attitude was one of a willingness to cooperate. He executed an advice of rights and waiver form. He was no longer under the influence of alcohol. There was no intimidation or coercion to obtain the waiver. The defendant's motion did not point to any specific basis for the claim of a *Miranda* violation except a delay in providing discovery. Therefore, it must be concluded there is no basis for Headdress to assert a violation of *Miranda*, see *Colorado v. Connelly*, supra; *United States v. Hack*, supra.

*Voluntariness*

Each defendant has challenged the statements that were given to the officers on the grounds the statements were involuntarily obtained in violation of due process clause of the Fifth Amendment. They have also referred to 18 U.S.C. § 3501(a) and (b). An involuntary confession violates due process *Colorado v. Connelly*, supra. This must be determined from the totality of the circumstances. *Haynes v. Washington*, 373 U.S. 503, 513–514, 83 S.Ct. 1336, 1342–1343, 10 L.Ed.2d 513 (1963); *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *United States v. Perdue*, 8 F.3d 1455 (10th Cir.1993). The prosecution bears the burden of establishing by a preponderance of the evidence that a defendant's statement was voluntary *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996).

In *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) the court said "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." 479 U.S. at 164, 107 S.Ct. at 520. Unless there is police misconduct, there is no basis for a claim of an involuntary confession.

We hold that coercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.

479 U.S. at 167, 107 S.Ct. at 522.

See also *Nickel v. Hannigan,* 97 F.3d 403 (10th Cir.1996).

The question to be determined is whether the defendants' will was overborne and the capacity for self determination critically impaired. *United States v. McCullah*, supra, p. 1101 citing to *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26, 93 S.Ct. 2041, 2046–47, 36 L.Ed.2d 854 (1973). See also *Nickel v. Hannigan,* supra. If there is police overreaching to satisfy *Colorado v. Connelly*, supra, the suspect's mental circumstances are relevant on the two issues. Id.; *Fikes v. Alabama*, 352 U.S. 191, 198, 77 S.Ct. 281, 285, 1 L.Ed.2d 246 (1957); *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961); *Nickel v. Hannigan*, supra at p. 410.

In addition, Congress has set forth voluntariness standards in 18 U.S.C. § 3501(b) which provides:

The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

### Voluntariness of Ankerpont's Statements

■ The three statements Ankerpont made, the first and second at the river crime scene and the third to Lieutenant Two Bulls on arrival at the jail, were clearly voluntary. Ankerpont had been given a *Miranda* warning by Officer Mountain Lion, told by his mother to tell the truth, had stopped Mountain Lion to tell him of the assault on Tapoof. Ankerpont was not under arrest or in custody for the first two statements. He willingly wrote out the affidavit which he left on the patrol vehicle. There was no police overreaching or improper conduct. No threat or coercion and Officer Mountain Lion attempted to make things comfortable and to comfort Ankerpont's mother. The third statement, made to Lieutenant Two Bulls at the jail, was merely a confirmation of the prior affidavit and the signing of the document. Though Ankerpont was lightly intoxicated it did not interfere with his willingness to speak. All three statements were voluntary. *Colorado v. Connelly,* supra.

■ The fourth statement of Ankerpont was elicited in an interview with Agent McPheters beginning at 1:50 p.m. Ankerpont was not intoxicated. He did not express discomfort, was not threatened or coerced nor promises made to him in exchange or inducement for his statement. Only McPheters and Tom were present in the room. A full *Miranda* warning was given and Ankerpont executed a written waiver of counsel and silence. There is no evidence of police overreaching except over six hours had passed from the time of his arrest without defendant being taken before a magistrate judge. However, defendant knew the charge was being investigated. He was an adult and a high school graduate. There is no basis on which to conclude the statement given on this occasion was involuntary.

The next statement was from a five minute interview beginning at 3:40 p.m. Again a *Miranda* warning was given and Ankerpont said he understood his rights and would speak with the officers. There was no coercion, duress, or police overreaching. There

is nothing to show any involuntary feature with regard to the defendant's statement. It was freely and voluntarily given and focused on whether another person was involved. It ended at 3:45 p.m.

■ The final interrogation of Ankerpont began at the Fort Duchesne jail interview room at 8:58 p.m. There was no relay questioning and a lapse of five hours from the prior interrogation had occurred. This is not a case where there had been extensive and uninterrupted questioning over a long period of time. The first session with McPheters lasted about an hour and 27 minutes and the second session was five minutes, after which there was a five hour period when Ankerpont was not questioned. The last session was only about ½ hour. This case bears no relationship to the conduct found improper in *Chambers v. Florida,* 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940); *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); *Ashcraft v. Tennessee,* 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944); *Harris v. South Carolina,* 338 U.S. 68 (1949) or *Reck v. Pate,* 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961).

Ankerpont was advised of his preinterrogation *Miranda* rights and executed a waiver of those rights immediately at 8:59 p.m. He gave McPheters and Lieutenant Two Bulls a written statement. The interview concluded at 9:30 p.m., so that the interrogation session lasted only about ½ hour. Ankerpont had only been arrested on a tribal charge, not a federal charge, although McPheters was pursuing a federal crime and believed Ankerpont had been arrested for homicide. Ankerpont knew the object of the interrogation. He had not asked for an attorney or a phone call. There is no evidence he was deprived of food or water.[11] No force, coercion, or threats were used against Ankerpont. The warning of his rights was the fourth time he had been advised. The only deficiency in the process, if any, was the fact that Ankerpont had not been taken before a magistrate judge. The circumstances otherwise show a fully volun-

---

**11.** Ankerpont made a statement in his brief that he was not fed, but there is no evidence of record for that statement. There is also no evidence of any causal effect between lack of food and Ankerpont's statement.

tary statement. *Colorado v. Connelly,* supra; *United States v. Muniz,* 1 F.3d 1018 (10th Cir.1993) (statements to police were voluntary and volunteered); *United States v. Robertson,* supra (statement in hospital voluntary); *United States v. Short,* 947 F.2d 1445 (10th Cir.1991) (statements of defendant were voluntary even though defendant was in pain, daughter in handcuffs); *United States v. Olsen,* 840 F.Supp. 842, 853 (D.Utah 1993) (no violation of due process in questioning cooperative defendant where no inducements, force or misrepresentation involved).

### *Voluntariness—Headdress' Statement*

■ Headdress was given a *Miranda* warning at 11:27 a.m. on his arrest at his home. No interrogation occurred. At 8:05 p.m., about 8½ hours after his arrest Headdress was interviewed at the Fort Duchesne Jail by Agent McPheters and Lieutenant Two Bulls. The interview lasted only about ½ hour. Headdress had been held in a cell at the jail. He had not been given food or water but he had not asked for either and was mildly intoxicated when he was arrested. He had not asked to speak to his mother who sought to see him but was refused. This circumstance differs from that in *Haynes v. Washington,* supra. He had not asked to make a phone call and if he had asked, it would have been allowed. The delay in the interrogation of Headdress was apparently due to the need to pursue others matters necessary to a proper investigation of the Tapoof homicide. During the interview Headdress asked for his glasses which were provided to him. At the end of the interview, he asked for a cup of water which was provided. The interview took place in a squad room, no bars were in the windows.

Before the interrogation Lieutenant Two Bulls gave Headdress a *Miranda* warning. Headdress indicated a willingness to talk and said he understood the advice and that he would speak to the officers. Headdress executed an advice of rights and waiver form. He was a high school graduate and an adult. He was not intoxicated at the time. During the interview he acted normally and was cooperative. No coercion, duress or promises were made. Although there was some delay and negligent restriction on providing water and food, the evidence shows this did not affect Headdress' decision to speak.[12] These were recommendable occurrences, but Headdress testified his statement was "voluntary." Therefore, it must be concluded that Headdress' statement to Agent McPheters was voluntary. *Colorado v. Connelly,* supra; *United States v. Short,* supra.

### *Voluntariness Under 18 U.S.C. § 3501(b)*

Congress, in 18 U.S.C. § 3501(b), has defined the elements to be considered in determining whether a confession is voluntary. Applying that standard to each of the defendants it is clear both Ankerpont and Headdress knew the nature of the offense involved. At the time of Ankerpont's first two statements he was not under arrest. The last four statements were when Ankerpont had been arrested. Ankerpont was not arrested for a federal charge but a tribal charge and the tribal courts were closed. The statement given by Headdress was made at a time that was not beyond the 48 hour period for judicial review of probable cause set out in *Riverside County, Calif. v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991).[13] See also, *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). Some of the statements of Ankerpont and the statement from Headdress were beyond the six hour period of 18 U.S.C. § 3501(c), but there is no evidence that the delay had any effect on the making of the statements. C.f. *United States v. Crocker,* 510 F.2d 1129 (10th Cir.1975).[14] Headdress was fully informed of his preinterrogation rights before being questioned and waived

---

12. The Supreme Court required a causal relationship between the improper police conduct and the suspect's confession in *Lisenba v. California,* 314 U.S. 219, 239–41, 62 S.Ct. 280, 291–92, 86 L.Ed. 166 (1941); *Ashdown v. Utah,* 357 U.S. 426, 431, 78 S.Ct. 1354, 1357, 2 L.Ed.2d 1443 (1958); and *Thomas v. Arizona,* 356 U.S. 390, 400, 78 S.Ct. 885, 890–91, 2 L.Ed.2d 863 (1958).

13. Whether the forty-eight hour standard applies to Indian tribal offenses is doubtful.

14. Any delay after the defendants' statements did not affect voluntariness and is irrelevant to that issue.

those rights. Therefore, applying the § 3501(b) criteria, the defendants Headdress and Ankerpont's statements were voluntary. *United States v. Brown,* 540 F.2d 1048 (10th Cir.1976); *United States v. Short,* supra.

*Delay In Taking Defendants Before A Magistrate Judge and 18 U.S.C. § 3501(c)*

■ Defendants, in their arguments and supplemental memorandum (File Entries # 96, # 97) have contended the delay in taking defendants before a magistrate judge requires a suppression of their statements. 18 U.S.C. § 3501(c) provides:

> In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Provided,* That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer.

Ankerpont's first three statements were well within the six hour standards of § 3501(c) and raise no issue. Only as to the third statement was Ankerpont under arrest. The first statement made to McPheters, which was the fourth statement of defendant, commenced at 1:58 and lasted to 3:17 p.m. so that it extended over six hours from the time of his arrest by Lieutenant Two Bulls at about 8:00 a.m. The fifth statement was between 3:40 and 3:45 p.m. and the last

statement at about 8:58 p.m. The last three statements fit within § 3501(c) and the six hour restriction. Ankerpont contends the statements are rendered inadmissible.

Headdress was arrested on a federal charge at about 11:20 on December 1, 1995. His interrogation was at 8:08 p.m. or about 8½ hours after his arrest. This was beyond the six hour period. Because of this delay, Headdress contends the statement he gave is inadmissible.

18 U.S.C. § 3501(c) was the Congressional replacement for the Supreme Court's two rulings in *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) and *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) that were decided under rule and statutory obligations of Government officers to take an arrested person before a committing officer. These decisions were predicated on federal statutory and rule law, not constitutional standards *Gallegos v. Nebraska,* 342 U.S. 55, 72 S.Ct. 141, 96 L.Ed. 86 (1951) and were superseded by § 3501(c). *United States v. Fallon,* 457 F.2d 15 (10th Cir.1972). § 3501(c) restricts the previous application of *McNabb/Mallory. United States v. Halbert,* 436 F.2d 1226 (9th Cir.1970). See also *United States v. Duncan,* 857 F.Supp. 852 (D.Utah 1994). Only if the statement is taken under circumstances that meet the criteria of § 3501(c) would it be subject to exclusion. The period of delay for consideration is the period from arrest to the taking of the statement, not the period from arrest to the presentment before the magistrate judge. In *United States v. Mitchell,* 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 (1944) applying the *McNabb* rule the court held a confession could be used where it was taken a few minutes after arrest even though there was an eight day delay in taking the defendant before a committing magistrate judge. Consequently, Ankerpont's first three statements are not effected by any delay.

In *United States v. Alvarez–Sanchez,* 511 U.S. 350, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994) the court considered the application of § 3501(c) and held it did not have application where the suspect was being held solely on state charges. As long as the suspect was

not held on a federal charge, the obligation of § 3501(c) did not apply even when the suspect was questioned by federal officers. The suspect had been arrested on state charges and three days later made a statement. The court held the statement admissible and that § 3501(c) did not apply because the statement was made during a period of state detention even if the defendant and defendant's federal arrest occurred after making the statement. The court said "Plainly, a duty to present a person to a federal magistrate does not arise until the person has been arrested for a *federal* offense . . ." (Emphasis in opinion). "Until a person is arrested or detained for a federal crime there is no duty, obligation, or reason to bring him before a judicial officer empowered to commit persons *charged* with offenses against the laws of the United States, and therefore no 'delay' under § 3501(c) can occur." 511 U.S. at 358, 114 S.Ct. at 1604 (Emphasis added). It "must be an 'arrest or other detention' for a violation of federal law." Id. The court went on to state:

> If a person is arrested and held on a federal charge by "any" law enforcement officer—federal, state, or local—that person is under "arrest or other detention" for purposes of § 3501(c) and its 6–hour safe harbor period. If, instead, the person is arrested and held on state charges, § 3501(c) does not apply, and the safe harbor is not implicated. This is true even if the arresting officers (who, when the arrest is for a violation of state law, almost certainly will be agents of the State or one of its subdivisions) believe or have cause to believe that the person also may have violated federal law. Such a belief, which may not be uncommon given that many activities are criminalized under both state and federal law, does not alter the underlying basis for the arrest and subsequent custody. As long as a person is arrested and held only on state charges by state or local authorities, the provisions of § 3501(c) are not triggered.

511 U.S. p. ——, 114 S.Ct. p. 1604.

The court did note the possibility of "improper collaboration between federal and state or local officers." Citing *Anderson v. United States,* 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829 (1943). That issue was not decided in *Alvarez–Sanchez.* Ankerpont was arrested on a Ute tribal charge. He was not arrested on a federal charge until December 2, 1995 after he gave his statements to the BIA officers and Agent McPheters.[15]

    Indian tribes are domestic dependent nations which exercise inherent authority over their members. *Oklahoma Tax Com'n. v. Citizen Band Potawatomi Indian Tribe of Oklahoma,* 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991); *Seneca–Cayuga Tribe of Oklahoma v. State of Oklahoma ex rel Thompson,* 874 F.2d 709 (10th Cir. 1989). Absent Congressional authorization, an Indian tribe's criminal jurisdiction does not extend to a non-tribal member. *Duro v. Reina,* 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990). A prosecution under tribal law is not one under federal law. See Frank Pommersheim, *The Contextual Legitimacy Of Adjudication In Tribal Courts And The Role of The Tribal Bar As An Interpretive Community: An Essay,* 18 New Mex. L.Rev. 49 (1988); *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) (conviction for contributing to the delinquency of a child in a Navajo Tribal Court did not bar prosecution in federal court for the Major Crimes Act offense of rape from the same incident); Sandra Day O'Connor, *Lessons From The Third Sovereign: Indian Tribal Courts,* 9 The Tribal Court Record 14 (1996). Indian tribes have the power to enforce their criminal laws against tribal members. They are a separate people with the power of regulating their internal affairs and social relations *Wheeler,* supra. Citing *United States v. Kagama,* 118 U.S. 375, 381–82, 6 S.Ct. 1109, 1112–13, 30 L.Ed. 228 (1886); *Ex parte Crow Dog,* 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1883). See also Indian Tribal Justice Act, 25 U.S.C. § 3601 et seq. § 3601(5) "tribal justice system are an essential part of tribal government. . . ." Therefore, even though Congress restricted the

---

**15.** The fact that McPheters had been under the impression that Ankerpont had been arrested on a federal charge is of no consequence, since that was not in fact the case.

extent of sanction a tribal court can impose,[16] the tribal offense is not a federal crime but one that can only be directed against Indians, *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978); *Duncan Energy Co. v. Three Affiliated Tribes of Fort Berthold Reservation,* 812 F.Supp. 1008, 1010 (D.N.D.1992) rev'd other grounds 27 F.3d 1294 (8th Cir.1994). See also *Felix S. Cohen's Handbook of Federal Indian Law* p. 250 (1982). Therefore, since Ankerpont was never arrested for a federal offense before he gave his statements,[17] he was not being held on a federal charge and 18 U.S.C. § 3501(c) had no application to him. Federal jurisdiction attached on his arrest on the Major Crimes Act charge of murder. This was after his statements. Therefore, 18 U.S.C. § 3501(c) cannot be a basis for the suppression of Ankerpont's statements.

In *United States v. Jackson,* 712 F.2d 1283 (8th Cir.1983), decided prior to *Alvarez–Sanchez,* the defendant was convicted of involuntary manslaughter. Defendant was an Indian and was arrested on an Indian reservation by BIA officers. He was intoxicated at the time of his arrest. The arrest was on July 11, 1981. Defendant was charged in tribal court with driving while intoxicated and driving on a suspended license. Defendant pled guilty on July 13 and was sentenced to jail. Thereafter, he was interrogated by an FBI agent on July 14, 1981. On July 29, 1981 another interrogation by the FBI in conjunction with a lie detector occurred and defendant made admissions as to the homicide. The court held defendant was in custody when arrested by the BIA officers. See also *United States v. DeMarce,* 513 F.2d 755, 757 (8th Cir.1975) (arrest by BIA law enforcement officers is a "federal arrest" under § 5032 [Juvenile Delinquency Act][18]). Relying on Eighth Circuit precedent, the court held it did not matter if defendant was not formally charged. 712 F.2d at 1286 (citing cases) and that an arrest by federal officers, BIA officers, triggered federal procedure. The court therefore concluded that the statement had been obtained in violation of *Mallory v. United States,* supra. Id. at p. 1286. However, because the statement was voluntary it did not have to be suppressed. 18 U.S.C. § 3501(c) was not discussed or mentioned in the opinion nor did the court seem to be aware of the fact that *Mallory* had been modified by Congress in § 3501(c). Not having the benefit of the Supreme Court's opinion in *Alvarez–Sanchez,* supra, the court's opinion focused more on the conclusion of a federal arrest by federal officers rather than an arrest on a federal charge. Ankerpont was not arrested for a federal offense but Headdress was. If in *Jackson,* defendant was in custody pursuant to a tribal sentence when defendant was questioned by the FIB, it is difficult to conclude that there was a federal crime that triggered the custody when defendant was questioned sometime later while serving the tribal sentence or that § 3501(c) was applicable. Therefore, the court in this case is not satisfied that the *Jackson* and Eighth Circuit analysis should be applied in this case.

If an Indian is arrested for a tribal offense there is nothing a federal court can do about the matter. Even if a BIA officer has made a "federal arrest," there is still no "federal jurisdiction" and no federal charge. Therefore, as Justice Thomas observed in *United States v. Alvarez–Sanchez,* supra, the "duty to present a person to a federal magistrate does not arise until the person has been arrested for a federal offense. Until a person is arrested for a federal crime, there is no duty, obligation, or *reason* to bring him before a judicial officer 'empowered to commit persons charged with offenses against the United States,' and therefore, no 'delay' under § 3501(c) can occur." 511 U.S. at 358, 114 S.Ct. at 1604 (Emphasis added). *Jackson* therefore is not good law in this case on the custody issue relating to Ankerpont and whether there was any unnecessary delay in taking him before a magistrate.

---

**16.** Indian Civil Rights Act, 25 U.S.C. § 1302(7).

**17.** At the time Lieutenant Two Bulls arrested Ankerpont for public intoxication there was probable cause to arrest him for being an accessory after the fact to murder (18 U.S.C. § 3) and possibly misprision of a felony (18 U.S.C. § 4).

**18.** The arrest was for a federal violation.

The interrogation of Headdress was 8½ hours after his arrest on the federal murder charge. In *Duncan,* supra, decided by this court, the defendant was arrested on April 28, 1993 at about 2:55 a.m. on a state charge. Both state and federal charges were being investigated and the court found the kind of working arrangement the Supreme Court said in *Anderson v. United States,* 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829 (1943) invoked federal law requirements. 857 F.Supp. at 860. The defendant made a statement within the six hour period of 18 U.S.C. § 3501(c) which this court said was not at issue. However, the defendant Duncan, was also interrogated by Agent McPheters and the BIA investigator at 2:08 p.m. on April 28, the following afternoon and had not been taken to a federal magistrate judge. This was beyond the six hour period of § 3501(c). This court held that because the confession was voluntary there was no requirement that the confession be excluded under 18 U.S.C. § 3501(a) & (c). See *United States v. Jackson,* supra; *United States v. Van Lufkins,* 676 F.2d 1189 (8th Cir.1982) (voluntariness rather than delay is the key to admissibility); *United States v. Gorel,* 622 F.2d 100 (5th Cir.1979) (Delay is only a factor to be assessed in determining voluntariness); *United States v. Perez–Bustamante,* 963 F.2d 48 (5th Cir.1992) (same); *United States v. Mayes,* 552 F.2d 729 (6th Cir.1977) (unnecessary delay is one of five relevant factors in determining voluntariness); *United States v. McCormick,* 468 F.2d 68 (10th Cir.1972) (delay does not necessarily require suppression).

■ 18 U.S.C. § 3501(c) is only applicable if there is unnecessary delay and the subsection expressly provides the six hour period does not apply if the trial judge finds the delay is reasonable based on the means of transportation and distance to be traveled to the nearest available magistrate judge. The nearest available magistrate judge for an initial presentment under this Court's order is Salt Lake City. The drive from Fort Duchesne to Salt Lake City is 2½ to 3 hours in good weather. Headdress was arrested at 11:20 a.m. Agent McPheters arrived on the scene at 11:30 a.m. or so. It was necessary to determine federal jurisdiction and to

pursue other routine investigative information matters. However, at least by 3:00 p.m. when the interrogation of Ankerpont first occurred, the preliminary matters had been attended to. Some of the delay was attributable to Agent McPheters' understandable desire to get the investigation focused and under control. However, prior to the enactment of § 3501(c), the Supreme Court held that desire to investigate is not a reasonable basis for delay. *Upshaw v. United States,* 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100 (1948). The United States, in its response memorandum on this issue, points to the lack of personnel to transport the prisoners. Captain Reynolds did not arrive back from Salt Lake City until about 3:00 p.m. However, Two Bulls or Mountain Lion did not apparently become available to transport the defendant. The protocol for transportation by the FBI was for two officers to make the transport of a prisoner.

The late time in the afternoon when Reynolds arrived back at Fort Duchesne and the limited personnel to transport made the holding of the defendants overnight for transport reasonable. *United States v. Van Poyck,* 77 F.3d 285, 288 (9th Cir.1996) (overnight delays are reasonable); *United States v. Fouche,* 776 F.2d 1398 (9th Cir.1985) (20 hour delay for overnight delay is not unreasonable). Defendant has the burden of proving the unreasonableness. Id. This has not been demonstrated. Further, there was need to deal with the special problem of the custody and situation of the juvenile. This was done after the juvenile was interviewed. Therefore, it is concluded the delay until the next day for transportation was not unreasonable. At that time, all of Ankerpont's statements and Headdress' statements had been taken and, therefore, are not subject to exclusion even though the delay lasted until Monday. *United States v. Mitchell,* supra. However, as will be seen, the delay, even if unreasonable, does not require the suppression of either of the defendants' voluntary statements.

In *United States v. Duncan,* supra, this court considered a similar issue. On the question of a BIA officer's status and function, the court dealt with the issue of state

police who had been cross authorized as BIA officers to act on the Uintah–Ouray reservation. At one point when the interrogation of the defendant took place, it was by a Roosevelt City police officer who was designated as a BIA officer and this court concluded the interrogation was by a BIA officer for the crime of burglary allegedly committed in Fort Duchesne.[19] Id. p. 857. Although, the discussion in *Duncan* is that the BIA officers were federal officers, the fact was that the defendant, who was an Indian, was arrested for at least one burglary on the Uintah–Ouray reservation, which is a federal felony under 18 U.S.C. § 1153. Therefore, the defendant's arrest in *Duncan* was for a federal offense and § 3501(c) was triggered.

In *Duncan,* supra, not cited by either side in this case, this court considered whether a violation of § 3501(c) required suppression of a statement made during the period of unreasonable delay. The court concluded it did not if the confession was otherwise voluntary. This court said:

> The defendant has cited no Tenth Circuit case in his brief as to whether 18 U.S.C. § 3501(c) would require suppression of the defendant's statements in this case. Defendant has cited the Ninth Circuit's opinion in Alvarez–Sanchez, supra, that was reversed, in part, by the United States Supreme Court, cited supra. The court left open the issue of whether 18 U.S.C. § 3501(c) requires suppression of an otherwise voluntary confession taken more than six hours after defendant was taken into custody by federal officers where defendant is not taken before a magistrate until more than six hours had passed. The Supreme Court in Alvarez–Sanchez, supra, noted there was a split of opinion among the federal Courts of Appeal on the interpretation of § 3501(c) but left the matter for resolution until another case. Justices Ginsburg and Blackmun concurring, 511 U.S. at 360, 114 S.Ct. at 1605 stated:
>
>> 18 U.S.C. § 3501(a) provides a "confession ... shall be admissible in evidence if it is voluntarily given." § 3501(b) sets

forth various factors to be considered in determining voluntariness. It has been determined that in this case, defendant's statements were voluntary. However, 18 U.S.C. § 3501(c) also provides that a confession "shall not be inadmissible solely because of delay in bringing [a] person before a magistrate ... if such confession is found by the trial judge to have been made voluntarily ... Provided, that the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer." Some courts have construed § 3501(c) to allow for a safe harbor of six hours for interrogation, but if the suspect is not taken before a magistrate until after six hours the confession must be excluded unless the time beyond the six hours is necessary because of the means and transportation to the nearest magistrate. Others have construed § 3501(c) to mean a confession if taken after six hours is admissible if voluntary and the period after six hours is only a factor to be considered in determining the issue of voluntariness because § 3501(b) provides the trial judge is to take into consideration "All the circumstances surrounding the giving of the confession" and this is also stated in § 3501(a & c). See *Alvarez–Sanchez,* supra, at 360, 114 S.Ct. at 1605 fn to concurring opinion of Justices Ginsburg and Blackmun. As noted, the defendant has cited only Ninth Circuit cases, whereas the controlling law in this district is that of the Tenth Circuit. *United States v. Spedalieri,* 910 F.2d 707, 709 (10th Cir.1990). Those courts that have considered the matter have applied 18 U.S.C. § 3501(c) to situations where the defendant is in the custody of a BIA officer. *United States v. Edwards,* 539 F.2d 689 (9th Cir.1976) (rape on Indian reservation, confession admissible where delay is attributable to shortage of personnel and

---

**19.** The defendant in *Duncan* was also interrogated by a BIA investigator. The court in *Duncan*

noted that BIA officers are federal officers. Id. at p. 860 n. 8.

vehicles and distance involved); *United States v. Bear Killer,* 534 F.2d 1253 (8th Cir.1976) (delay measured from time Indian defendant was apprehended by BIA officer).

The Tenth Circuit has rejected the rule of the Ninth Circuit that a statement taken beyond the six hours in § 3501(c) is inadmissible if otherwise voluntary. *United States v. McCormick,* 468 F.2d 68, 74–75 (10th Cir.1972) (delay only one factor); *United States v. Crocker,* 510 F.2d 1129 (10th Cir.1975) (delay more than six hours is a factor in determining voluntariness); *United States v. Shoemaker,* 542 F.2d 561, 563 (10th Cir.1976) (voluntariness is sole factor under § 3501); *United States v. Short,* 947 F.2d 1445, 1450–51 (10th Cir. 1991): The federal statute governing admissibility of confessions provides that a confession is not generally inadmissible solely because of delay in bringing a person before a magistrate if the confession was voluntarily made within six hours immediately following arrest or detention. Defendant does not contend he confessed more than six hours after his arrest or detention. Defendant's confession thus falls within the time frame set by the law. Furthermore, we have already held Defendant's confession was voluntary and have therefore addressed the "sole constitutional requisite governing the admission of a confession in evidence." *United States v. McCormick,* 468 F.2d 68, 75 (10th Cir. 1972), cert. denied, 410 U.S. 927, 93 S.Ct. 1361, 35 L.Ed.2d 588 (1973). We note the six-hour time limit is merely a factor in determining voluntariness, and confessions taken more than six hours after arrest can be admitted. Id. at 74; 18 U.S.C. § 3501(a)–(e). See also *United States v. Shoemaker,* 542 F.2d 561, 563 (10th Cir.) (voluntariness is the sole test for admitting a confession and delays caused by a defendant do not render the confession inadmissible), cert. denied, 429 U.S. 1004, 97 S.Ct. 537, 50 L.Ed.2d 616 (1976). This construction appears to coincide with § 3501 taken as a whole *King v. St. Vincent's Hosp.,* 502 U.S. 215, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) (statute is to be read as a whole,

because statutory language, plain or not, depends on the context); *General Motors Acceptance Corp. v. Rupp,* 951 F.2d 283 (10th Cir.1991) (description of the statute as whole is to be considered); *Negonsott v. Samuels,* 933 F.2d 818 (10th Cir.1991) (interpretation should be made that gives full effect to all provisions for statute); *Aulston v. United States,* 915 F.2d 584 (10th Cir.1990) (court looks to provisions of whole law, and to its object and policy). In 18 U.S.C. § 3501(a), the statute expressly states that voluntariness controls admissibility. This statement is also found in § 3501(c) the section containing the six hour proviso. Also, § 3501(b) expressly states voluntariness is to be determined from all the surrounding circumstances and expressly includes in subsection (1) the "time elapsing between arrest and arraignment of the defendant ..." This strongly supports the conclusion that a delay less than six hours is not a significant factor on voluntariness, but a period of over six hours may be considered but will be deemed reasonable if transportation and distance justify it.

857 F.Supp. pp. 861–862.

■■■ § 3501(c) does not require exclusion of a statement that is otherwise voluntary. See also cases supra p. 1298. If a statement is taken during a period of unreasonable detention the statement need not be excluded if voluntary. The period of unreasonable detention is only one factor to be considered in determining if the suspect's statement is voluntary.

All of the statements of both defendants were voluntarily given. The delay in presentment of defendants to a magistrate judge had no effect on any statement made by any defendant.[20] They were voluntary within the meaning of 18 U.S.C. § 3501(a) and are admissible.

### Conclusion

The defendants Royja Kelly Ankerpont and Charles Headdress' motions to suppress their statements should be denied.

---

**20.** Headdress did not testify to such effect and said his statement was voluntary.

Copies of the foregoing Report and Recommendation are being mailed to the parties who are hereby notified of their right to object to the same. The parties are further notified that they must file any objections to the Report and Recommendation within ten (10) days after receiving it. Failure to file objections may constitute a waiver of those objections on subsequent appellate review.